1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  XPANDORTHO, INC., a Delaware | ) Case No.:  3:21-cv-00105-BEN-KSC |
| corporation; EXACTECH, INC., a Florida | ) |
| 12  corporation, | ) **ORDER:** |
|  | ) |
| 13                      Plaintiffs, | ) |
|  | ) **(1) DEFENDANTS' MOTION TO** |
| 14  v. | )     **DISMISS IS DENIED;** |
|  | ) |
| 15  ZIMMER BIOMET HOLDINGS, INC., a | ) **(2) DEFENDANTS' MOTION TO** |
| 16  Delaware corporation; ZIMMER, INC., a | )     **STRIKE IN PART PLAINTIFFS'** |
| Delaware corporation; ZIMMER U.S., | )     **FIRST AMENDED COMPLAINT** |
| 17  INC., a Delaware corporation doing | )     **IS DENIED;** |
| business as ZIMMER BIOMET | ) |
| 18  SOUTHERN CALIFORNIA; | ) **(3) DEFENDANTS' REQUEST FOR** |
| ORTHOSOFT ULC, a Canadian | )     **JUDICIAL NOTICE IS DENIED;** |
| 19  corporation doing business as ZIMMER | ) |
| 20  CAS, | ) **(4) PLAINTIFFS' REQUEST TO** |
|  | )     **STRIKE DEFENDANTS'** |
| 21                      Defendants. | )     **EXHIBITS 2 THROUGH 4 IS** |
|  | )     **DENIED, BUT PLAINTIFFS'** |
| 22  | )     **REQUEST TO DISREGARD** |
| 23  | )     **THE EXHIBITS IS GRANTED;** |
|  | )     **AND** |
| 24  | ) |
| 25  | ) **(5) THE PARTIES' MOTIONS FOR** |
|  | )     **LEAVE TO FILE UNDER SEAL** |
| 26  | )     **ARE GRANTED.** |
| 27  | ) |
| 28  | ) **[ECF Nos. 44, 46, 48, 49, 51, 56]** |

## I.   **INTRODUCTION**

Plaintiffs XpandOrtho, Inc., a Delaware corporation ("XpandOrtho"), and Exactech, Inc., a Florida corporation ("Exactech") (collectively, "Plaintiffs") bring this action against Defendants Zimmer Biomet Holdings, Inc., a Delaware corporation; Zimmer, Inc., a Delaware corporation; Zimmer US, Inc., a Delaware corporation doing business as Zimmer Biomet Southern California; and ORTHOsoft ULC, a Canadian corporation doing business as Zimmer CAS (collectively, "Defendants") for alleged misuse of confidential information, fraud, unfair competition, breach of contract, and copyright infringement. First Amended Complaint, ECF No. 34 ("FAC") at 3, ¶ 1.

Before the Court are the following motions: (1) Defendants' Motion to Dismiss the FAC, ECF No. 44; (2) Defendants' Motion to Strike In Part the FAC, ECF No. 44; (3) Defendants' Request for Judicial Notice, ECF No. 44-1; (4) Plaintiffs request to strike or alternatively, disregard Exhibits 2 through 4 to Defendants' Motion to Dismiss, ECF No. 48 at 15; (5) Defendants' Motion for Leave to File Certain Exhibits and Text Supporting their Motion to Dismiss and Strike Under Seal, ECF Nos. 46 and 56; and (6) Plaintiffs' Motion for Leave to File Portions of Their Opposition Under Seal, ECF No. 51.

The motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure.  ECF No. 58. After considering the papers submitted, supporting documentation, and applicable law, the Court (1) **DENIES** Defendants' Motion to Dismiss; (2) **DENIES** Defendants' Motion to Strike; (3) **DENIES** Defendants' Request for Judicial Notice; (4) **DENIES** Plaintiffs' request to strike Exhibits 2 through 4; (5) **GRANTS** Plaintiffs' request to disregard Exhibits 2 through 4; and (6) **GRANTS** all Motions to file documents under seal.

## II.   **BACKGROUND**

This case involves the alleged misuse of confidential information related to acquisition discussions and the exchange of information between Defendants and XpandOrtho.  XpandOrtho is a medical device company developing soft tissue balancing technology for knee surgery.  Plaintiffs allege the following eight claims for relief: (1)

violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836; (2) violation of the California Uniform Trade Secrets Act, Cal. Civ. Code, section 3426, *et seq.*; (3) breach of contract; (4) fraud; (5) breach of the implied covenant of good faith and fair dealing; (6) intentional interference with prospective economic advantage; (7) copyright infringement; and (8) violation of California's Unfair Business Practices Law, Cal. Bus. & Prof. Code section 17200, *et seq.* FAC at 1.

## A.    <u>Statement of Facts</u>[1]

Plaintiffs allege that in 2012, two orthopedic surgeons, Dr. Clifford Colwell and Dr. Darryl D'Lima, "founded XpandOrtho to develop new technology to address the problem of inaccurate soft tissue balancing during total knee arthroplasty." FAC at 3, ¶ 2; 14, ¶ 47. As a small startup, XpandOrtho "sought to join forces with an established company to bring its technology to market." *Id.* at 3, ¶ 2; 15, ¶ 51.

In 2015, Defendants and XpandOrtho initiated acquisition discussions. *Id.* at 15, ¶ 51. On March 4, 2015, before disclosing any proprietary information to Defendants, XpandOrtho and Defendants entered into a nondisclosure agreement (the "2015 NDA"). *Id.* at 30, ¶ 96. Dr. Colwell signed on behalf of XpandOrtho, and Bradlee M. Quick (Defendants' VP of Knee Marketing) signed on behalf of Defendants. *Id.* at 30, ¶¶ 96–97. XpandOrtho continued to interact with Mr. Quick during 2015 and "[f]rom the very beginning, XpandOrtho made clear to [Defendants] that the content of the discussions would be covered by an NDA." *Id.* at 31–32, ¶ 105. On March 12, 2015, after signing the 2015 NDA, Dr. Colwell and Dr. D'Lima met with John Sillick (a general manager of Defendants) in La Jolla, California and discussed XpandOrtho's XO¹ device. *Id.* at 32, ¶ 106. "Mr. Sillick provided XpandOrtho with . . . [Defendants'] knee implant to use in their

---

[1]    The majority of the facts set forth are taken from the FAC and for purposes of ruling on Defendants' Motion to Dismiss, the Court assumes the truth of the allegations pled and liberally construes all allegations in favor of the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

demonstration for [Defendants]" at a future meeting.  *Id.*

In late March 2015, Dr. Colwell and Dr. D'Lima met with Mr. Quick to show "a sample XO¹ device and conduct[] a 'dry' demonstration of [such]."  *Id.* at 32, ¶ 107.  They also showed Mr. Quick "a PowerPoint presentation including scientific data from XpandOrtho's tests" and its XO¹ Animation, which depicts "measuring balance data through [the device's] full range of motion."  *Id.*  After the March 2015 meetings, Defendants were not willing to initiate formal acquisition discussions, but "expressed continued interest and encouraged XpandOrtho to stay in contact."  *Id.* at 32, ¶ 108.

Plaintiffs allege that to Defendants, the most valuable information regarding "the XO¹ device could only be obtained by inspecting, manipulating, and 'play[ing] with'" it.  *Id.* at 33, ¶ 113.  On November 6, 2015, Defendants' employee, Brian May, asked Dr. D'Lima, 'Would it be possible to send us a unit for us to play with? While we'd certainly like to see it in the OR, *we feel we can learn the most by using the device instead of only observing its use.*'"  *Id.*  When XpandOrtho brought up concerns over whether the 2015 NDA still covered the discussions, Mr. May replied that it did and there was "[n]o need to execute a new agreement."  *Id.* at 33–34, ¶ 113.

Pursuant to the NDA, Dr. D'Lima subsequently "sent the XO¹ Animation in an email to [Defendants'] employees Mr. Quick, Mr. May, and Bill Hartman."  *Id.* at 34, ¶ 114.  "The XO¹ Animation was hosted on Vimeo and was password-protected and marked as 'Private' on the Vimeo site.  The email . . . included a link to the Vimeo site and . . . the password."  *Id.*  In August 2016, Dr. D'Lima shared the video with Dr. Russell Schenk of Defendants, who promised to protect and limit access to the video.  *Id.* at 34, ¶ 115.

In March 2016, Defendants informed "XpandOrtho they were not ready to commit to an acquisition because the device was not FDA approved yet."  *Id.* at 33, ¶ 110.  Instead, Defendants "suggested conducting an expanded clinical study of the XO¹, which Defendants" offered to fund.  *Id.*  Although XpandOrtho drafted a proposal for the study and met with two of Defendants' employees regarding the matter, Defendants called off the study in November 2016, "without providing a reason beyond budget availability."  *Id.*

at 33, ¶¶ 110–112.

In October 2017, Mr. Hartman initiated email discussions with Dr. D'Lima and "asked about the status of XpandOrtho's prototype device," indicating that Defendants were interested in reviewing the technology. *Id.* at 34, ¶ 116. A meeting was scheduled for February 6, 2018, in Chicago. *Id.* In the meantime, on November 6, 2017, Dr. D'Lima emailed Mr. Hartman the password for the XO[1] Animation "to demonstrate the capabilities of the XO[1] device, hoping this would help convince [Defendants] to acquire XpandOrtho." *Id.* at 35, ¶117.

On February 2, 2018, unbeknownst to XpandOrtho and four days prior to the Chicago meeting, Defendants' employee "Pierre Couture filed a provisional patent application at the U.S. Patent Office . . . ." *Id.* at 35, ¶ 118. XpandOrtho had no knowledge that Defendants had been working on the device depicted in the provisional application. *Id.* at 35, ¶ 121. Plaintiffs further allege Defendants and Mr. Couture were not "actually developing any soft tissue balancing device . . . ." *Id.* at 35–36, ¶¶ 120–121.

On February 6, 2018, Dr. Colwell and Dr. D'Lima met with Mr. Couture and Mr. Hartman in Chicago, where "Mr. Couture asked technical questions about the XpandOrtho device, including questions that elicited non-public, confidential and proprietary information . . . ." *Id.* at 36, ¶¶ 122–123. Defendants "instructed Mr. Couture and its other employees to use the diligence process to gain as much proprietary information from XpandOrtho as possible so that Defendants had the option to pursue a similar device after [Defendants] called off the acquisition." *Id.* at 36, ¶ 123. "[A] demonstration of the capabilities of the XO[1] device and software" was presented at the meeting, and there was discussion of "future possibilities for the XO[1] product line." *Id.* at 36, ¶ 124.

Several meetings occurred during March 2018. On March 8, 2018, XpandOrtho met with Defendants' CFO and employees Linda Smyth and Ewald Kreid (Defendants' VP of Corporate Strategy and Business Development), "and XpandOrtho gave a presentation to surgeons associated with [Defendants]." *Id.* at 37, ¶ 125. Anticipating a letter of intent that would prevent XpandOrtho from discussing acquisition with other companies, "Dr.

Colwell and Dr. D'Lima sought to gauge [Defendants'] level of commitment and how long the due diligence process would take." *Id.* At another March meeting, Defendants "said they intended to make an acquisition offer as part of the due diligence process." *Id.*

Also in March, Dr. Colwell and Dr. D'Lima met with "Dr. Louis-Phillipe Amiot, [employee of Defendants and] the founder of ORTHOsoft, during which non-public XpandOrtho information was disclosed." *Id.* at 37, ¶ 126. They discussed "the concept of integrating the XO[1] with [Defendants'] robotic surgery system, called ROSA." *Id.*

In 2018, XpandOrtho sought to extend the terms of the 2015 NDA. *Id.* at 30, ¶ 99. On May 8, 2018, XpandOrtho and Defendants executed an Amendment (the "2018 Amendment")[2] to the 2015 NDA. *Id.* at 30–31, ¶ 99. Dr. Colwell signed on behalf of XpandOrtho and Mr. Kreid signed on behalf of Defendants. *Id.* at 31, ¶ 99. In the NDAs, Defendants "agreed to keep XpandOrtho's proprietary information confidential," contracting "to hold it 'in strict confidence,' 'not to divulge' the information, 'not to make any use whatsoever at any time' of the information except for the limited purpose of evaluating a business relationship with XpandOrtho, and 'not to decompile, disassemble or reverse engineer' the information." *Id.* at 31, ¶ 101.

During April and May of 2018, XpandOrtho and Defendants negotiated the Letter of Intent ("LOI"). *Id.* at 38, ¶ 128. The first proposal of the letter "contained several unfavorable material terms that Defendants initially refused to negotiate," and Defendants "strongly rejected the inclusion of a ██████████████ if [Defendants] were to later back away from" acquisition. *Id.* at 38, ¶ 129. ██████ also sent XpandOrtho a letter of intent, ██████████████ than those of Defendants' proposed letter. *Id.* at 38, ¶

---

[2]      The 2015 NDA and 2018 Amendment will be referred to collectively as, the NDAs. Furthermore, throughout the entire FAC, Plaintiffs allege XpandOrtho relied on the NDAs when divulging confidential, proprietary, and/or trade secret information and devices to Defendants. *See, e.g.*, *id.* at 52, ¶ 176; 53, ¶ 181. The Court understands Plaintiffs plead reliance on the NDAs and will not restate these repetitive assertions in the Statement of Facts.

130–131.  On April 30, 2018, XpandOrtho informed Defendants (through Mr. Kreid and Mr. Rob Braun) of the more favorable letter of intent.  *Id.* at 38, ¶ 132.

On May 6, 2018, Mr. Kreid emailed a revised letter to Dr. Cowell, Dr. D'Lima, and other XpandOrtho board members.  *Id.* at 39, ¶ 134.  This revised letter "was drastically more favorable for XpandOrtho, both in price and material terms, and ultimately, became the LOI."  *Id.* at 39, ¶¶ 134–35.  Defendants' CFO, Daniel P. Florin, signed the LOI on behalf of Defendants.  *Id.* at 39, ¶ 134.  "The new LOI ████████████████████ ████████████████████████████████████," and "reversed course on several representations and warranties [Defendants] previously refused to negotiate."  *Id.* at 39, ¶ 135.  Defendants, however, insisted on including an exclusivity period in the LOI (not allowing XpandOrtho to discuss acquisition with other companies) and "continued to refuse to agree to a breakup fee" should Defendants call off the acquisition.  *Id.*  Plaintiffs allege Defendants included the favorable terms "with the specific intent of luring XpandOrtho into ending . . . acquisition discussions with Exactech" and "using the diligence process to gain as much proprietary information from XpandOrtho as possible" for improper use in developing Defendants' own product.  *Id.* at 39, ¶ 136.

On May 8, 2018, XpandOrtho and Defendants signed the LOI, commencing the due diligence period.  *Id.* at 40, ¶ 137.  Upon signing the LOI, XpandOrtho "████████████ ████████████████"  *Id.*  Also on May 8, 2018, in email correspondence, Mr. Kreid committed to XpandOrtho that Defendants' "intention with this acquisition is to profitably develop, manufacture and market the XpandOrtho technology."  *Id.* at 40, ¶ 138.  Plaintiffs allege, however, that Defendants did not intend to acquire XpandOrtho and instead, "desired to prevent or delay competitors such as Exactech from acquiring XpandOrtho and to obtain XpandOrtho's confidential and proprietary information, including . . . Trade Secrets,[3] and improperly use the information in their own development."  *Id.* at 40, ¶ 140.

---

[3]      Plaintiffs allege XpandOrtho's trade secrets include (but are not limited to): (1) geometry, dynamics, and kinematics of the XO[1] device; (2) the XO[1] Animation and

"Mr. Kreid knew his commitment was false and intended to cause XpandOrtho to rely on his misrepresentation," and XpandOrtho did reasonably rely on the commitment. *Id.* at 40–41, ¶ 140.

Defendants requested a large amount of information pursuant to the NDA, which Dr. D'Lima shared through a "private and confidential folder on the file-sharing website Dropbox to serve as a data room." *Id.* at 41, ¶ 141. Over 700 files were uploaded. *Id.* Defendants' employee Katy Hawkins sent a list of forty-six team members who would need access to the information, and when Dr. D'Lima asked if the whole team needed access, Ms. Hawkins affirmed. *Id.* at 41, ¶ 143. Due to security measures on the file-sharing website, Dr. D'Lima could not give access to all forty-six people and in response, Ms. Hawkins sent a list of twenty-eight people instead. *Id.* at 42, ¶¶ 144–45. Ms. Hawkins highlighted in red certain individuals who did not necessarily need access, and Mr. Couture was not listed in red. *Id.* at 42, ¶ 145. Dr. D'Lima gave access to additional personnel as requested. *Id.* at 42, ¶ 147.

The data room contained "detailed engineering drawings of the XO[1], including three-dimensional CAD models of the individual components, as well as assemblies of the components." *Id.* at 42, ¶ 148. There were over 100 CAD files with which Defendants

---

information regarding XO[1] contained therein; (3) designs of prototypes using multiple actuators; (4) designs of sensors for soft tissue balancing devices; (5) benefits of certain characteristics of the XO[1]; (6) confidential portions of XpandOrtho's communications with the FDA respecting 510(k) certification; (7) methods of sterilizing the XO[1] device; (8) manufacturing information for the XO[1] device; (9) the wireless link between the controller and the radio module; (10) the custom circuit board input in the trial implant, controller, and radio module; (11) source code for the trial implant, controller, PC radio module, and the tablet PC GUI; (12) calibration processes, equipment, and software; and (13) the negative know-how contained in the history and results of XpandOrtho's development process (*i.e.*, the design paths evaluated, as well as reasons for following certain design paths over others). *Id.* at 25–27, ¶ 84. Plaintiffs allege these trade secrets "were developed by XpandOrtho in the course of its business at significant time, effort, and expense . . . ." *Id.* at 28, ¶ 86.

"could simulate motion of the XO¹ device throughout its entire range of motion," among other things. *Id.* at 43–44, ¶ 148. The "files also included two-dimensional engineering drawings ("blueprints") used for manufacturing the parts" consisting of "precise dimensions, manufacturing tolerances, assembly instructions, material to use for each component, revision history," and more. *Id.* at 44, ¶ 149. The drawings contained the condyle plate, along with the components, instructions for assembly, detailed dimensions, and other information. *Id.* at 43–44, ¶¶ 149–50. The FAC alleges an extensive amount of information in the data room, including the XO¹ Animation, and only some of the information is described here. *See id.* at 44–48, ¶¶ 152–161.

On May 23 through 25, 2018, Defendants "spent three days in Southern California . . . meeting with XpandOrtho and its suppliers." *Id.* at 48, ¶ 162. Confidential information regarding XpandOrtho's manufacturing and quality assurance programs was disclosed during the visit. *Id.* at 48, ¶ 164.

On May 30, 2018, Defendants' consultant, "Dr. Clarke, performed an evaluation of the XO¹ on two cadaver knees at . . . [Defendants'] lab in Scottsdale, Arizona." *Id.* at 49, ¶ 165. XpandOrtho allowed Defendants to observe the evaluation "because XpandOrtho believed they were in an advanced stage of due diligence." *Id.* at 49, ¶ 166. "Dr. Clarke operated on two cadaver knees during this evaluation" and "during the first surgery, the XO¹ device was incorrectly placed, resulting in less-than-ideal balance—during the second surgery, there were no issues, and the knee was well-balanced." *Id.* at 49, ¶ 167. Photos were taken during the evaluation and "were never shared with XpandOrtho, nor . . . returned to XpandOrtho." *Id.* at 51, ¶ 172. "During and after the cadaver lab, Dr. Colwell and [Dr.] D'Lima" discussed "several possible improvements they had been planning," including confidential information regarding modifications to the condyle plate and a noncompartmental design. *Id.* at 50, ¶ 169. On May 31, 2018, in email correspondence to Dr. D'Lima, Mr. Hartman stated, "I believe in the current state we could use the system and only make it better with ███████████████." *Id.* at 51, ¶ 171.

On May 31, 2018, Defendants' employees met with XpandOrtho in Solana Beach,

California, and "discussed software, risk management, the DHF, use of the device, testing, manufacturing, and the projected cost of goods sold." *Id.* at 51, ¶ 173–74.  Defendants also reviewed copies of confidential documents, which XpandOrtho made available to them, "including the Design History File, FDA testing records, . . . some of XpandOrtho's early quality system," and more.  *Id.* at 51, ¶ 174.

Defendants' ORTHOsoft team also made several "specific requests for highly sensitive information, including XpandOrtho's source code, access to several XO¹ devices that they could take apart . . . , and CAD models of the condyle plate."  *Id.* at 52, ¶ 176. Dr. D'Lima ultimately shared requested source code with two employees through a dedicated folder, outside the data room, because Dr. D'Lima was not comfortable sharing the code with a large number of people.  *Id.* at 52–53, ¶¶ 177–79.

On June 6, 2018, a direct competitor of Defendants filed a Freedom of Information Act ("FOIA") request to obtain the 510(k) XO¹ Application, and Dr. D'Lima notified Defendants' employee, Ms. Hawkins.  *Id.* at 54, ¶ 184.  "XpandOrtho redacted the 510(k) application to prevent any confidential information from being released due to the FOIA request," and the redacted "application was published under FOIA Request 2017-5574." *Id.* at 54, ¶ 185.

"On June 4, 2018, Dr. D'Lima shipped to [Defendants] two XO¹ devices and a Windows tablet computer to run the custom-developed, confidential software for data acquisition and display."  *Id.* at 54, ¶ 187.  The shipped devices contained additional materials and instructions for use of the XO¹ device, and the devices were received on June 5, 2018.  *Id.* at 54–55, ¶ 187.  Defendants informed "XpandOrtho they were only using these devices for mechanical bench testing."  *Id.*  Plaintiffs allege Defendants "conducted extensive mechanical testing on at least one of the XO¹ devices it received on June 5, 2018," providing details of the alleged testing.  *Id.* at 55, ¶ 188.  Mr. May acknowledged that "play[ing] with" and "using the device" provided the most information, more than simply "observing its use," even "in the OR."  *Id.* at 55, ¶ 190.  Defendants "acquired a wealth of confidential information about the XO¹ device," through their "hands-on testing

-10-

and handling . . . . that could not have been determined from publicly available information." *Id.* at 55, ¶ 192.

 "Mr. Couture was very involved in the diligence process and very informed about the analysis and testing of the XO¹, especially the mechanical testing." *Id.* at 56, ¶ 196. Mr. Couture was present during a phone call on June 15, 2018. *Id.* During the call, Mr. Couture indicated for the first time "that the tilt limitation [regarding the XO¹ device] was an issue," which surprised Dr. Colwell and Dr. D'Lima because "the feedback from [Defendants'] surgeon consultants had been generally positive." *Id.* at 57, ¶ 197. "Mr. Couture was also concerned about a related limitation of the XO¹ concerning the device geometry in a specific configuration." *Id.*

Also "[o]n June 15, 2018, XpandOrtho conducted a clinical evaluation on a live patient in La Jolla, California," with three of Defendants' personnel present. *Id.* at 57, ¶ 198. "Dr. D'Lima conducted a 'dry' demonstration" first to show Defendants "how the device worked." *Id.* at 58, ¶ 200. The XO¹ device was then used on the patient's knee— "[t]he surgery went very well, and the knee was well-balanced." *Id.* Defendants indicated excitement over the device, and there was discussion of "how the XO¹ could be combined with other techniques and technologies . . . ." *Id.* at 58, ¶ 201.

Defendants performed another live clinical evaluation of the XO¹ in a cadaver lab on June 15, 2018, and no XpandOrtho employees were present. *Id.* at 59, ¶ 202. Defendants did not inform XpandOrtho of the clinical evaluation until a few days prior and when XpandOrtho indicated that it wanted Dr. Colwell or Dr. D'Lima in attendance, Defendants did not allow for rescheduling. *Id.* at 59, ¶ 203. No XpandOrtho employees were present and as Dr. Colwell and Dr. D'Lima suspected, Defendants' employees "struggled without . . . [them] there, in particular when doing the gap balance technique." *Id.* at 59, ¶ 204. More discussions of potential modifications and improvements occurred between XpandOrtho and Defendants. *Id.* at 60, ¶ 208.

On June 20, 2018, Defendants "terminated the due diligence process and told XpandOrtho they would not be proceeding with an acquisition." *Id.* at 62, ¶ 213. Upon

termination, XpandOrtho terminated Defendants' access to the data room and source code repository and reminded Defendants that the "proprietary information remained confidential and that [Defendants] could make no further use of it." *Id.* at 62, ¶¶ 214, 216. Defendants were also asked "to return all 'products, materials and [p]roprietary information. . . .'" *Id.* at 62, ¶ 215.

Defendants failed to respond for a few days but eventually returned one of the XO[1] devices, saying "they had disposed of the [other] XO[1] device as biohazardous . . . ." *Id.* at 62–63, ¶ 216. Defendants never confirmed whether they "deleted all of the electronic information XpandOrtho had provided them." *Id.* at 63, ¶ 216. Defendants did not provide "specific reasons for terminating the deal but did mention mechanical testing in the June 20, 2018 phone call." *Id.* at 63, ¶ 217. Dr. Colwell and Dr. D'Lima were surprised by the termination based on the demonstrations and feedback Defendants provided. *Id.*

Three weeks after terminating the deal, Defendants "secretly filed two provisional patent applications" naming Mr. Couture as the inventor—the applications included figures taken directly from XpandOrtho's materials. *Id.* at 63, ¶ 218. Defendants "later filed nonprovisional applications that claim priority to the[] two provisional applications, as well as to [Defendants'] February 2018 [P]rovisional . . . ." *Id.* These nonprovisional applications were "later published as U.S. Patent Publication Nos. 2019/0240045 . . . and 2019/0240046 . . . ."

During March 2019, after reentering negotiations, Exactech acquired XpandOrtho,[4] but neither Plaintiff knew Defendants had misappropriated XpandOrtho's information, and as such, had been harmed by Defendants' conduct. *Id.* at 5, ¶ 5. "Exactech seeks to further develop and bring to market XpandOrtho's technology" and at the time of acquisition, "believed it was acquiring a company with intellectual property assets that had not been misappropriated," establishing that both Plaintiffs were harmed by Defendants. *Id.*

---

[4] "XpandOrtho is now a wholly-owned subsidiary of Exactech." *Id.* at 6, ¶ 8.

-12-

Plaintiffs allege Defendants' conduct and "abuse of the due diligence process is part of its pattern and practice of ignoring confidentiality obligations." *Id.* at 5, ¶ 6.  Plaintiffs provide examples, citing three situations exemplifying Defendants' alleged improper use of trade secrets, occurring between 2011 and 2021.  *Id.* at 5–6, ¶ 6; 84–87, ¶¶ 298–309.

All of these allegations are important for deciding whether Plaintiffs' claims for relief are plausible and cognizable.

## B.   Procedural History

On January 20, 2021, Plaintiffs brought suit against Defendants by filing their original complaint.  ECF No. 1.  On May 28, 2021, Defendants filed a Motion to Dismiss the original complaint.  ECF No. 20.  On June 21, 2021, Plaintiffs filed their FAC and on June 29, 2021, the Court denied Defendants' original Motion to Dismiss as moot and granted-in-part Plaintiffs' request to file the unredacted version of their FAC under seal, which was lodged as ECF No. 31.  *See* ECF No. 34; ECF No. 36 at 11–15.

On July 27, 2021, the parties filed a Joint Motion for Leave to File Excess Pages for Defendants' forthcoming motion (and related briefing) responding to the FAC.  ECF No. 42.  The Court granted the Joint Motion on July 29, 2021.  ECF No. 43.

On July 30, 2021, Defendants filed a Motion to Dismiss and Strike Portions of the FAC, ECF No. 44 ("Motion"); a Motion for Leave to Allow the Non-Electronic Filing of Exhibits G and O to Defendants' Motion to Dismiss and Strike, ECF No. 45; and a Motion for Leave to File Documents Under Seal, ECF No. 46.  On August 24, 2021, Plaintiffs filed an Opposition to Defendants' Motion to Dismiss and Strike the FAC, Opposition, ECF No. 48 ("Oppo."); and an Opposition to Defendants' Request for Judicial Notice, ECF No. 49.  Plaintiffs also requested that the Court strike Exhibits 2 through 4 to Defendants' Motion to Dismiss.  ECF No. 48 at 15.  That same day, Plaintiffs filed a Motion for Leave to File Portions of Their Opposition Under Seal.  ECF No. 51.  On August 31, 2021, Defendants filed a (1) Reply brief, ECF No. 55 ("Reply"), and (2) Motion for Leave to File the Reply Under Seal, ECF No. 56.

On February 23, 2022, the Court granted Defendants' Motion for Leave to File

Video Exhibits Non-Electronically.[5]  ECF No. 73.

## III.  **DISCUSSION**

Defendants seek: (1) to dismiss all claims in Plaintiffs' FAC; (2) to strike certain allegations in the FAC as immaterial, impertinent, disparaging, and scandalous; and (3) judicial notice of nineteen Exhibits attached to the declaration of Jeffrey A. Pade, ECF No 44-7 (the "Pade Decl.").  *See* Motion; ECF No. 44-1 at 2–4.  Plaintiffs seek to strike Defendants' Exhibits 2 through 4.  *See generally* Oppo.; ECF No. 49.  Lastly, Plaintiffs and Defendants filed Motions for leave to file under seal portions of their briefing and accompanying Exhibits.  The Court addresses each issue in turn.

### A.  **Motion to Dismiss**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must be facially plausible to survive a motion to dismiss).  The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  On a motion to dismiss, a court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *Manzarek*, 519 F.3d at 1031.  However, a court is not required to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

#### 1.  **Rule 8(a) Pleading Standard**

Defendants argue Plaintiffs fail to plead their claims for violations of California's Unfair Business Practices Law, Cal. Bus. & Prof. Code section 17200, *et seq.*  (the "UCL")

---

[5]  Despite this Order, the Court never received Exhibits G and O.  However, because the Court will not engage in resolving factual disputes, the Exhibits at issue are not required to decide Defendants' Motion.  *See infra* Part III.A.6–7; Part III.B.

1   and intentional interference with prospective economic advantage in conformance with
2   Rule 8(a) of the Federal Rules of Civil Procedure.  Motion at 22–26.  Rule 8(a) requires
3   only a short and plain statement of the claim.  Fed. R. Civ. P. 8(a).

### i.   *Intentional Interference with Prospective Economic Advantage*

5       Under California law, a plaintiff alleging a claim for relief for intentional
6   interference with prospective economic advantage must prove: "(1) an economic
7   relationship between the plaintiff and some third party, with the probability of future
8   economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3)
9   intentional [wrongful] acts on the part of the defendant designed to disrupt the relationship;
10  (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately
11  caused by the acts of the defendant." *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137,
12  1151 (9th Cir. 2008).  Plaintiffs have sufficiently pled a plausible claim for relief.

13      Defendants argue Plaintiffs' allegations of XpandOrtho's potential business
14  relationship with Exactech is too speculative to state a claim, because they consist of only
15  "prospective negotiations," which do not suffice.  Motion at 32–33.  Defendants further
16  argue that "Exactech's alleged prospective negotiations to acquire XpandOrtho also did
17  'not hold the promise' of future economic advantage." *Id.* at 33.  Defendants explain the
18  alleged advantages are not sufficiently definite and that it is only speculation that Exactech
19  would have acquired XpandOrtho earlier but for Defendants' LOI.  *Id.*  Defendants further
20  contend whether Exactech would have developed, improved, and marketed its technology
21  based on XpandOrtho's confidential information and whether an advantageous market for
22  such technology existed, are also speculative.  *Id.* at 33–34.  Finally, Defendants contend
23  Plaintiffs failed to plead a wrongful act, because entering into agreements such as the
24  NDAs and LOI cannot be considered independently harmful.  *Id.* at 34.  However, the
25  suggested additional allegations go beyond what is required.

26      Plaintiffs correctly contend that Defendants' arguments related to the alleged
27  economic benefits are premature, and that these arguments raise factual questions
28  regarding "the amount of technological development and profit Exactech would have

received from an earlier acquisition of XpandOrtho." *Id.* at 30–31.

The existing allegations go beyond what is required by Rule 8(a) to include numerous details, such as: (1) ████████ provided XpandOrtho with a letter of intent, including ████████████████ than the one offered by Defendants; (2) Defendants, including Mr. Kreid, knew the value and economic advantages of gaining access to XpandOrtho's confidential and trade secret information; (3) Defendants and Mr. Kreid, knowing of the ████████ letter, subsequently offered the LOI with ████████████, with the intention of fraudulently inducing XpandOrtho to sign; (4) Defendants' new LOI included an exclusivity period requiring XpandOrtho to ████████████████████ ████████ ; (5) Exactech's acquisition of XpandOrtho was delayed as a result of signing the LOI with Defendants; and (6) Exactech's delayed acquisition resulted in reduced economic advantages and ultimately, irreparable injury. FAC at 38, ¶¶ 130–133; 102–106, ¶¶ 397– 99, 401–409. Furthermore, Plaintiffs specifically allege several prospective economic advantages, including the "advantage of being the sole user of XpandOrtho's confidential, proprietary, and trade secret information," and "the sole innovator to develop and market new technology" based on this information. *Id.* at 103, ¶ 399.

The Court agrees with Plaintiffs and finds the FAC sufficiently pleads a claim for intentional interference of prospective economic advantage. First, Plaintiffs allege an existing relationship between Exactech and XpandOrtho based on allegations of previous negotiations between them, as well as ████████ letter of intent. These exchanges plausibly describe actual negotiations—not just prospective negotiations. Second, Plaintiffs' allegations of economic benefit rely on their assertion that the information was confidential and/or constituted trade secrets, the truth of which is a factual dispute for summary judgment or trial. *See infra* Part III.A.6. For example, Defendants benefited from the use of this information through its filing of patent applications—if Defendants were in fact, the sole recipient of XpandOrtho's technical information, that exclusive access constitutes a benefit. If the information was public, however, the benefit would not exist. Because the issue of whether the information was public raises questions of fact, not

appropriate for a motion to dismiss, *see infra* Part III.A.6, Plaintiffs' allegations suffice at this stage in the proceedings.

Finally, Defendants' contention that entering into the NDAs and LOI was not independently wrongful ignores Plaintiffs' allegations that XpandOrtho relied on Defendants' misrepresentations in signing the LOI. The alleged misrepresentations form the wrongful act. Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claim for intentional interference with prospective economic advantage.

### ii.  *UCL Claim*

California's UCL prohibits business acts or practices that are: (1) fraudulent, (2) unlawful, or (3) unfair. *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 878 (N.D. Cal. July 16, 2010); *see also Sybersound*, 517 F.3d at 1151 (applying California law). Each prong of the UCL constitutes a separate and distinct theory of liability. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). Plaintiffs have sufficiently pled a plausible claim for relief.

"A 'business act or practice' is 'unlawful' under the unfair competition law if it violates a rule contained in some other state or federal statute." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1673 (2017) (citing *Rose v. Bank of America, N. A.*, 57 Cal. 4th 390, 396 (2013)). Where a plaintiff cannot state a claim under a "borrowed" law, he or she cannot state a UCL claim, but that is not the case here. *See, e.g.*, *Ingels v. Westwood One Broad Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (2005) ("A defendant cannot be liable under § 17200 for committing unlawful business practices without having violated another law"); *see also Silvas v. E-Trade Mortgage Corp.*, 514 F. 3d 1001, 1007 n.3 (9th Cir. 2008).

"The 'unfair' prong under the UCL, targets conduct that 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Satmodo, LLC v. Whenever Commc'ns, LLC*, No. 17-cv-0192-AJB-NLS, 2017 WL 1365839, at *8 (S.D. Cal. Apr. 14, 2017) (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999)).

-17-

Accordingly, a plaintiff must allege that a defendant's conduct "(1) violates the policy or spirit of the antitrust laws because the effect of the conduct is comparable to or the same as a violation of the antitrust laws, or (2) it otherwise significantly threatens or harms competition." *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 165 F. Supp. 3d 937, 953 (S.D. Cal. Feb. 25, 2016) (quoting *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 662 (2005)) (internal citations omitted).

Defendants argue Plaintiffs' allegations for unlawful and unfair practices under the UCL are insufficiently pled. Motion at 35. First, Defendants contend Plaintiffs have not pled an injury in fact and a resulting loss of money or property due to the unfair competition. *Id.* Defendants explain the amount of Plaintiffs' damages are unknown, and that Plaintiffs do not plead any property belonging to them that Defendants acquired. *Id.* Second, Defendants argue Plaintiffs' claim for unfair competition does not plead a violation of antitrust law, or the policy or spirit of such, and therefore, the claim fails. *Id.* at 36. Finally, Defendants argue Plaintiffs' claim for unlawful acts is not based on a violation separate from the UCL, and that Plaintiffs' other common law claims do not suffice. *Id.*

Plaintiffs argue the UCL claim is that Defendants used its powerful position in the medical device field to induce a small startup into signing "an LOI by dangling the prospect of a blow-out price and promising profitable futures." Oppo. at 27. Plaintiffs argue this conduct was taken "to frustrate the efforts of its competitor, Exactech, to get a foothold in the soft tissue balancing industry space," which are precisely the type of acts prohibited by the unfair prong of the UCL. *Id.* (citing *Satmodo*, No. 3:17-cv-00192, 2017 WL 1365839, at *8).

Defendants' argument that Plaintiffs do not plead that any of Plaintiffs' property was acquired by Defendants is incorrect. Throughout the FAC, Plaintiffs allege that Defendants were given Plaintiffs' devices, as well as confidential, proprietary, and trade secret information. *See, e.g.*, FAC at 41–47, ¶ 141–61. Plaintiffs further plead they did not receive all the information back. *See id.* at 51, ¶ 172; 63, ¶ 216. Plaintiffs alleged

-18-

confidential information is Plaintiffs' property, which Defendants were given.  In addition, Defendants' argument that Plaintiffs fail to state an injury is also incorrect.  Plaintiffs' UCL claim plainly reads:

> As an additional result of such acts, Plaintiffs have suffered, and will continue to suffer, irreparable harm by Defendants unlawful practices and unfair competition, including but not limited to their business reputations, good will, and stature, in the business community and with its customers, for which there is no adequate remedy at law, thereby justifying injunctive relief.

*Id.* at 108, ¶ 433.  Furthermore, although Plaintiffs do not provide a precise sum of their UCL damages, they allege that the amount will be proven at trial.  *Id.* at 108, ¶ 432.  Plaintiffs' prayer for relief provides the contours of Plaintiffs' alleged damages, including but not limited to Defendants' profits, disgorgement of any unjust monetary gains, and Plaintiffs' lost profits.  *See id.* at 110–111, at ¶¶ 11–14.  Finally, while Plaintiffs do not plead a specific violation of antitrust law, Plaintiffs clearly allege Defendants' intentions, and the actions taken, to frustrate its competitor, Exactech, in its attempt to acquire XpandOrtho.  *See, e.g., id.* at 38–41, ¶¶ 128–41.  Defendants' alleged conduct, including its intent and the actions taken to disrupt the Exactech negotiations, is conduct that violates the spirit of antitrust law, because it delayed Exactech's acquisition of XpandOrtho.  This delay removed Exactech from the marketplace for XpandOrtho's technology for a period of time.  *See Satmodo*, No. 17-cv-0192-AJB-NLS, 2017 WL 1365839, at *8 (finding conduct that removes a competitor from the marketplace for a period of time "violates the spirit of antitrust laws and seriously threatens competition").  Plaintiffs also allege harm to Exactech, based on Exactech's belief "that it was acquiring a company with intellectual property assets that had not been misappropriated."  *Id.* at 5, ¶ 5; 110, ¶ 14.  Accordingly, Defendants' Motion to Dismiss Plaintiffs' UCL claim for failure to state a claim pursuant to Rule 8(a) is **DENIED**.

### 2.   Claims Sounding in Fraud

A claim sounds in fraud when the plaintiff "allege[s] a unified course of fraudulent

conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003). "[C]laims sounding in fraud are subject to the heightened pleading requirements of Rule 9(b)." *Goldstein v. Gen. Motors LLC*, 445 F. Supp. 3d 1000, 1010 (S.D. Cal. Apr. 13, 2020). An entire complaint, or an entire claim within a complaint, can sound in fraud, *see Vess*, 317 F.3d at 1107, but fraud does not suddenly become an element of such claims. *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1125 (S.D. Cal. Mar. 22, 2012), *aff'd sub nom.*, *Fresno Cty. Employees' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)). Instead, [w]here averments of fraud are made in a claim in which fraud is not an element, . . . [t]he proper route is to disregard [the] averments . . . not meeting Rule (9)(b)'s standard and then ask whether a claim has been stated.'" *Mallen*, 861 F. Supp. 2d at 1125 (quoting *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)). "Fraud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud . . . " but "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1105 (citations omitted); *see also Kearns*, 567 F.3d at 1124.

Defendants argue all eight of Plaintiffs' claims sound in fraud and must therefore satisfy the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. Motion at 15. Plaintiffs concede that four of their claims do sound in fraud, including claims for fraud, for breach of the implied covenant of good faith and fair dealing, for intentional interference with prospective economic advantage, and the UCL claim. Oppo. at 24–25. However, Plaintiffs argue these four claims already do satisfy Rule 9(b). *Id.* Plaintiffs contend the remaining four claims, including those for trade secret misappropriation, for breach of contract, and for copyright infringement, do not sound in fraud. *Id.* at 23. In *Vess*, the entirety of the complaint was comprised of allegations of a unified fraudulent course of conduct. 317 F.3d at 1106. That is not the case here. The detailed allegations set forth in Plaintiffs' 111-page FAC sufficiently plead all claims for

1  relief.

2            i.    ***Trade Secret Misappropriation Claims***

3        To plead a claim for misappropriation of trade secrets, a plaintiff must allege both

4  the: (1) existence of a trade secret and (2) subsequent misappropriation of that trade secret.

5  *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. July 6, 2012) (Benitez,

6  J.).   The existence of a protectable trade secret is necessary for a trade secret

7  misappropriation claim under the California Trade Secrets Act ("CUTSA") as well as the

8  federal Defend Trade Secrets Act ("DTSA").   "Federal courts in the Ninth Circuit look to

9  *Diodes* for guidance on the applicable pleading standard for claims brought under the

10  CUTSA." *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 77 (N.D. Cal. 2020)

11  (citing, *inter alia*, *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)).   In *Diodes*,

12  the California Court of Appeal set out the appropriate pleading standard for pleading the

13  existence of a trade secret:

14

15          Before a defendant is compelled to respond to a complaint based upon claimed

16          misappropriation or misuse of a trade secret . . . , the complainant should
        describe the subject matter of the trade secret with sufficient particularity to

17          separate it from matters of general knowledge in the trade or of special
        knowledge of those persons who are skilled in the trade, and to permit the

18          defendant to ascertain at least the boundaries within which the secret lies. If
        the subject matter of the claimed trade secret is a manufacturing process, *the*

19          *plaintiff must not only identify the end product manufactured, but also supply*
        *sufficient data concerning the process*, without revealing the details of it, to

20          give both the court and the defendant reasonable notice of the issues which
        must be met at the time of trial and to provide reasonable guidance in

21          ascertaining the scope of appropriate discovery.

22

23

24  260 Cal. App. 2d at 253 (emphasis added); *see also Pellerin*, 877 F. Supp. 2d at 988.

25        Defendants argue Plaintiffs' factual allegations related to trade secret

26  misappropriation focus only on the XO[1] Animation, and that the remaining allegations are

27  based only "on information and belief."  Motion at 26.  Defendants also contend Plaintiffs

28  are alleging disclosure of trade secrets but are assuming misappropriation without alleging

how Defendants "misappropriated the alleged trade secrets to develop its knee-balancing technology." *Id.*  Finally, Defendants argue Plaintiffs rely on speculation, not facts, which is insufficient to survive a motion to dismiss.  *Id.* at 27.

Plaintiffs argue Defendants mischaracterize the trade secrets at issue and base their argument on the false premise that the other trade secrets alleged do not form the basis of any claim.  Oppo. at 16.  Plaintiffs contend the trade secrets particularly described in paragraph 84 of the FAC are the trade secrets forming the basis of Plaintiffs' trade secret and breach of NDA claims.  *Id.*

Finally, Plaintiffs argue the trade secret allegations are not speculative because they allege how Defendants misappropriated the trade secrets.  Defendants accessed the information by utilizing XpandOrtho's reliance on the NDAs, used that information to develop their own technology, and published that information in their patent applications. *Id.* at 20–21.  Plaintiffs further explain "to the extent Plaintiffs' allegations are based on information and belief, it is because, as is typical in trade secret cases, the granular proof of misappropriation is in the possession of Defendants."  *Id.* at 21.

Here, the Court finds Plaintiffs have sufficiently pled trade secret misappropriation. Plaintiffs list thirteen general trade secrets along with explanations.  For example, Plaintiffs list "[m]anufacturing information for the XO¹ device" as one trade secret, naming the end product but also explaining that the protected information involves the "[m]aterials used for the components of the XO¹ device," and "[t]he processes for joining components of the XO¹ device together."  FAC, at 26, ¶ 84.  In addition, Plaintiffs allege broadly that "[g]eometry, dynamics, and kinematics of the XO¹ device" constitute a trade secret.  *Id.* at 25, ¶ 84.  Plaintiffs then provide five specific examples of such, one of them being "[d]etailed three-dimensional kinematics of the XO¹ as the knee moves through its range of motion, determined from examining, handling, and measuring the XO¹ device."  *Id.* Plaintiffs further allege "source code" as a trade secret and go on to state the product the source code involves, as well as the code's firmware version with respect to each product. *Id.* at 27, ¶ 84.

Plaintiffs also allege the efforts taken to maintain the secrecy of XpandOrtho's trade secrets, including: (1) the use of NDAs; (2) restricting physical access to XpandOrtho's facilities—(*i.e.*, a front desk receptionist, key cards, physical keys, and restricted areas with limited access for written documents), and password protected file-sharing systems. *Id.* at 29–30, ¶¶ 91–95. Reading the FAC in the light most favorable to the non-moving party, the Court finds Plaintiffs have sufficiently pled the existence of trade secrets.

The Court also finds Plaintiffs have sufficiently alleged misappropriation of their trade secrets. Defendants' assertion that Plaintiffs allege only three trade secrets disclosed in Defendants' patent applications is too self-forgiving. Plaintiffs allege thirteen trade secrets (with additional subcategories) and refer to those trade secrets collectively as XpandOrtho's Trade Secrets. *Id.* at 25–27, ¶ 84. In alleging misappropriation through patent applications, Plaintiffs refer to XpandOrtho's "Trade Secrets" several times, implicating all alleged trade secrets in the patent applications at issue. *Id.* at 66–80, ¶¶ 231–32, 236–37, 239, 250, 254–55, 266, 272–73, 275–77. Plaintiffs allege how Defendants gained access to the trade secrets—through various meetings, discussions, and evaluations, during which XpandOrtho provided the information pursuant to the NDA. *See e.g.*, *id.* at 37–38, ¶¶ 125–27; 57–58, ¶ 197–201. Plaintiffs allege that Defendants used the information to develop their own technology, evidenced by XpandOrtho's information appearing in Defendants' published patent applications. *See e.g.*, *id.* at 76, ¶ 264. Furthermore, Plaintiffs' allegations, made on information and belief, set out several facts. For example, Plaintiffs allege that even after calling off the acquisition, "Defendants refused to return or destroy all the materials obtained from XpandOrtho, including electronic materials and summaries of testing of confidential XpandOrtho devices . . . ." *Id.* at 37, ¶ 238. Accordingly, Plaintiffs have successfully stated a claim for trade secret misappropriation.

Regarding Defendants' assertion that Plaintiffs' trade secret claims sound in fraud and are therefore subject to Rule 9(b)'s heightened pleading requirement, it matters little. When stripped of the fraudulent allegations, Plaintiffs' claims for trade secret

-23-

misappropriation remain undisturbed.  As stated above, Plaintiffs allege numerous trade secrets in paragraph 84 of the FAC.  In addition, Plaintiffs allege Defendants accessed the trade secrets pursuant to the NDAs and subsequently published them in patent application filings.  Whether or not Defendants made fraudulent misrepresentations when entering into the LOI, based on Plaintiffs' allegations, Defendants violated the NDAs by disclosing confidential trade secret information and thus, misappropriated Plaintiffs' alleged trade secrets.  Therefore, Plaintiffs' claims for misappropriation of trade secrets do not sound in fraud.  Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claims for trade secret misappropriation for failure to state a claim.

### ii.   *Breach of Contract Claim*

A claim for relief for breach of contract under California law must show: (1) a legally enforceable contract between the parties; (2) the defendant's breach of that contract; and (3) damage to the plaintiff caused by the defendant's breach.  *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1062 (9th Cir. 2017); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1489 (2006).

Plaintiffs describe, and Defendants do not deny, that XpandOrtho and Defendants signed and agreed to the terms of the 2015 NDA and the 2018 Amendment.  Upon these NDAs, Plaintiffs plead two legally enforceable contracts.  Plaintiffs also successfully plead breach of the NDAs by Defendants, based on allegations that Defendants were not permitted to disclose confidential information covered by the NDA but did so despite their contractual obligations.   Finally, Plaintiffs sufficiently state damages caused by Defendants' breach through allegations of lost revenue that Plaintiffs would have received but for Defendants' violation of the NDAs.

All of the above allegations remain intact even absent Plaintiffs' fraud allegations.  Whether or not Defendants made fraudulent misrepresentations when entering into the LOI, the contract claims do not "sound in fraud" because Plaintiffs plead Defendants breached the NDA by disclosing confidential information, resulting in alleged damage to Plaintiffs.  Therefore, Plaintiffs' breach of contract claim does not sound in fraud and is

subject only to the general pleading standard of Rule (8)(a).   The Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claim for breach of contract for failure to state a claim.

### iii.   *Copyright Infringement Claim*

A violation of copyright infringement requires: (1) ownership of a valid copyright, and (2) that the defendant copied elements of the protected work.   *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc).

Plaintiffs' FAC alleges "[t]he XO¹ Animation is a set of sequential illustrations, and as such, is a creative artistic work subject to the highest degree of copyright protection." FAC at 105, ¶ 412.   Plaintiffs further allege "XpandOrtho owns all U.S. copyright rights in the XO¹ Animation and owns a valid and subsisting copyright registration, U.S. Reg. No. PAu 4-057-718 for that work." *Id.* at 105, ¶ 413.   Finally, Plaintiffs set forth allegations that Defendants continue "to engage in, the unauthorized copying, reproduction, and distribution of the XO¹ Animation, and the unauthorized preparation, reproduction, and distribution of derivative works based on the XO¹ Animation." *Id.* at 106, ¶ 414.   Plaintiffs further specify the three images used in Defendants' provisional applications in alleging infringement. *Id.* at 106, ¶¶ 415–16.

Defendants do not argue the copyright claim fails to meet Rule 8(a)'s pleading standard—only that it does not meet the heightened standard of Rule 9(b).   However, none of Plaintiffs' fraud allegations, relating to Defendants' misrepresentations to induce XpandOrtho into signing the LOI, are present in Plaintiffs' allegations for copyright infringement.   Plaintiffs' claim for copyright infringement, therefore, does not "sound in fraud" and is not subject to Rule 9(b).   Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' copyright infringement claim for failure to state a claim.

### 3.   Heightened Pleading Under Rule 9(b)

"In alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . , [while] [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."   Fed. R. Civ. P. 9(b).   "[T]o plead fraud with

1    particularity, the complaint must allege the time, place, and content of the fraudulent

2    representation; conclusory allegations do not suffice . . . . Claims made on information and

3    belief are not usually sufficiently particular unless they accompany a statement of facts on

4    which the belief is founded." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d

5    1035, 1042 (9th Cir. 2010) (citing *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531,

6    540 (9th Cir.1989)).

7        As to all claims,[6] Defendants argue Plaintiffs' fraudulent allegations are "based

8    solely 'on information and belief,' unaccompanied by specific alleged facts as necessary

9    under Rule 9(b)." Motion at 15–16.  That is an over-generalization that does not pan out.

10   Defendants point to several examples in the FAC of what they claim to be allegations based

11   solely on information and belief.  *Id.* at 16.  *See also* FAC at ¶¶ 379, 123, 136, 140, 309,

12   379, 391, 392, 402, 404.  Defendants contend "Plaintiffs' core [fraud] allegation is based

13   solely 'on information and belief' that 'Mr. Kreid and [Defendants] did not intend to

14   acquire XpandOrtho at the offered price,' and instead 'actually intended to prevent or

15   substantially delay . . . . Exactech . . . from acquiring XpandOrtho's technology.'" Motion

16   at 16 (citing FAC at 99–100, ¶ 379).  Defendants argue that without these allegations,

17   Plaintiffs' fraud theory relies on "two primary facts: (1) Plaintiffs allowed Defendants to

18   access information during the acquisition discussions under an NDA; and (2) Defendants

19   filed patent applications with images of the XO[1] device." *Id.* at 16.  Defendants contend

20   these allegations "cannot establish fraud as a matter of law, and the FAC thus fails under

21   Rule 9(b)." *Id.*  Defendants also argue Plaintiffs fail to identify specific individuals and at

22   most, identify only corporate Defendants.  *Id.*  Defendants contend that although the fraud

23   and intentional interference claims "name at least one individual" allegedly involved in

24

25

26   [6]    As established above, the Court will apply the heightened pleadings standard of Rule
27   9(b) only to Plaintiffs' claims for fraud, breach of the implied covenant of good faith and
     fair dealing, intentional interference with prospective economic advantage, and violation
28   of the UCL.

some fraudulent conduct, the accompanying allegations include "impermissible non-limiting language, such as 'for example' or 'including.'"  *Id.* at 17 (citing FAC at ¶¶ 367, 379, 398–99, 401–408, 410).

Plaintiffs say that the claims subject to Rule 9(b) rest on the "allegations concerning the negotiations between [Defendants] and XpandOrtho before signing the LOI."  Oppo. at 24–25.  Plaintiffs explain these claims are pled with sufficient particularity, because the FAC identifies: (1) the who, as Ewald Kreid; (2) the what, as Defendants' stated commitment to XpandOrtho based on its intention to profitably develop, manufacture, and market XpandOrtho's technology; (3) the when, as May 8, 2018; (4) the where, as email correspondence; and (5) the how, as Defendants' inducement of XpandOrtho to sign the LOI and thereby interrupt negotiations with Exactech.  Oppo. at 25.  Plaintiffs further contend that "[t]he text of Rule 9(b) make clear that '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'"  *Id.* at 26 (quoting Fed. R. Civ. P. 9(b)).

Reading the allegations in the light most favorable to Plaintiffs, the Court agrees that those claims involving fraud provide the who, what, when, where, and how required by Rule 9(b).  The FAC identifies Mr. Kreid as the who and Defendants' commitment to XpandOrtho to profitably develop, manufacture, and market its technology as the what.  *See* FAC at 30–31, ¶ 99; 40, ¶ 138.  The FAC further pleads May 8, 2018, as the when, and email correspondence as the where.  *See id.* at 30–31, ¶ 99; 40, ¶ 137–38.  Finally, Plaintiffs plead the how as Defendants' inducement of XpandOrtho to sign the LOI, ███████████ ███████████████████████ requiring XpandOrtho to ████████████████████████ ████████.  *See, e.g., id.* at 39, ¶¶ 136–38, 140.

Additionally, Defendants' broad-brush criticism that Plaintiffs' allegations are made "on information and belief," disregards those paragraphs in the FAC that provide specific factual allegations.  Plaintiffs do allege Defendants' intent based on information and belief, along with whether certain individuals were Defendants' employees, representatives, or consultants.  However, these allegations are surrounded by specific factual allegations,

-27-

such as: (1) Defendants' representations made during discussions with XpandOrtho, (2) Defendants' initial letter of intent, (3) Defendants' revised and improved LOI, (4) Defendants' insistence on an ███████████████████████████; (5) Defendants' abrupt termination of the deal with little explanation; and (6) Defendants' use of XpandOrtho's information in patent filings. *See id.* at 38–40, ¶ 129–39; 62–63, ¶¶ 213–218. These surrounding facts provide sufficient context and support for those allegations made on information and belief.

Furthermore, the core fraud allegations (which Defendants argue are made on information and belief) involve Defendants' intentions related to inducing XpandOrtho to sign the LOI in order to gain access to confidential information and delay Exactech's prospective acquisition of XpandOrtho. Rule 9(b) specifically permits allegations of malice, knowledge, and intent to be pled generally. Fed. R. Civ. P. 9(b). Therefore, Plaintiffs' allegations regarding Defendants' intentions and knowledge are sufficiently pled under Rule 9(b). Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claims for fraud, breach of the implied covenant of good faith and fair dealing, intentional interference with prospective economic advantage, and violation of the UCL.

### 4. <u>Preemption Under CUTSA</u>

CUTSA preempts common law and statutory claims that allege the same nucleus of facts as a trade secret misappropriation claim. *See Applied Biological Lab'ys, Inc. v. Diomics Corp.*, No. 3:20-cv-2500-AJB-LL, 2021 WL 4060531, at *5 (S.D. Cal. Sept. 7, 2021) (citing *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 961 (2009)). "However, state law claims that rely on additional and different facts or theories of liability than those forming the basis for the trade secret claim are not preempted . . . ." *Amron Int'l Diving Supply, Inc. v. Hydrolinx Diving Commc'n, Inc.*, No. 11-cv-1890-H-JMA, 2011 WL 5025178, at *9 (S.D. Cal. Oct. 21, 2011). Specifically, CUTSA excludes from preemption "(1) contractual remedies, whether or not based upon misappropriation of a trade secret, [and] (2) other civil remedies that are not based upon misappropriation of a trade secret . . . ." Cal. Civ. Code § 3426.7.

-28-

Defendants argue Plaintiffs' claims for fraud, intentional interference with prospective economic advantage, and violation of the UCL, are preempted by CUTSA and should therefore, be dismissed. Motion at 18. Defendants contend all of these claims "stem from the same nucleus of facts" regarding Defendants' acquisition discussions with XpandOrtho and alleged misuse of XpandOrtho's information. *Id.* at 17. Defendants argue CUTSA is the exclusive civil remedy for claims based on a nucleus of facts alleging misappropriation of trade secrets and the wrongful taking of business and proprietary information. *Id.* at 17–18. Defendants also argue that Plaintiffs' attempt to avoid preemption by asserting fraud in the FAC but because fraud remains inseparable from the alleged misappropriation, the claim is preempted. *Id.* at 18–19.[7] Defendants similarly argue Plaintiffs' allegations of intentional interference with prospective economic advantage and violation of the UCL cannot support independent claims when "stripped of the facts supporting trade secret misappropriation." *Id.* at 19–20.

Plaintiffs, of course, disagree because their intentional interference claim relies on conduct separate and apart from their trade secret allegations. Oppo. at 31 (citing *R.R. Donnelley & Sons Co. v. Pappas*, No. 2:21-cv-00753-JAM-AC, 2021 WL 3488502, at *3 (E.D. Cal. Aug. 9, 2021)). Essentially, Plaintiffs' lawsuit says that Mr. Kreid and others working on behalf of Defendants made an offer to acquire XpandOrtho, "pushing forward

---

[7]   Defendants further note that Plaintiffs' fraud claim is also preempted by the Copyright Act "because it relies on alleged harm that is equivalent to that in Plaintiffs' copyright claim—that Defendants misused and disclosed frames from the XO¹ Animation." Motion at 18 n.4. Defendants make this argument in a footnote with no further explanation or analysis. *See id.* Plaintiffs contend the argument fails because the harm resulted from Exactech's delay in acquiring XpandOrtho, and not from the use of the copyrighted images. Oppo. at 33 n.13. Given the dispute and reading the FAC in the light most favorable to the non-moving party, the Court agrees with Plaintiffs. *See also Khoja v. Orexigen Therapeutics*, Inc., 498 F. Supp. 3d 1296, 1309 (S.D. Cal. Nov. 2, 2020) (quoting *Cheever v. Huawei Device USA, Inc.*, No. 18-cv-06715-JST, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019)) (explaining that parties waive "arguments raised only in footnotes").

under the pretense of a potential acquisition," without a serious interest in acquiring XpandOrtho.  Oppo. at 31.  Defendants' purpose was to "prevent or substantially delay Exactech and XpandOrtho from consummating their negotiations," and Defendants caused this "delay by having XpandOrtho agree to the LOI," ████████████████████ ████████ requiring XpandOrtho to ████████████████████.  *Id.* at 31.  Plaintiffs explain that "even if no trade secret misappropriation had taken place, Exactech's acquisition of XpandOrtho would have still been delayed as a result of [Defendants'] interference."  *Id.* at 32.  Plaintiffs further argue their fraud and UCL claims fall outside the scope of CUTSA preemption.  *Id.* at 32–33.  Plaintiffs contend these claims are "based in part on misrepresentations made during the LOI negotiation process between April and May of 2018," establishing "a clear delineation in time between these allegations and the allegations that form the basis of Plaintiffs' trade secret misappropriation claims."  *Id.* at 32.

Many district courts have evaluated factual issues related to CUTSA preemption in deciding motions to dismiss.  *See Yeiser Rsch. & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1051–52 (S.D. Cal. Nov. 29, 2017) (deciding CUTSA preemption on a motion to dismiss); *Applied Biological Lab'ys*, No. 3:20-cv-2500-AJB-LL, 2021 WL 4060531, at *7 (same); *Applied Pro. Training, Inc. v. Mira Costa Coll.*, No. 10-cv-1372-DMS-MDD, 2011 WL 13127664, at *3 (S.D. Cal. Aug. 30, 2011) (same).  However, other courts have held that the fact-based analysis of CUTSA preemption is better suited for summary judgment or trial rather than a motion to dismiss.  *See Amron*, No. 11-cv-1890-H-JMA, 2011 WL 5025178, at *10 ("Other courts have held that the question of preemption cannot be addressed prior to determining whether the allegedly misappropriated information constitutes a trade secret."); *DJO Glob., Inc. v. Glader*, No. 3:16-cv-02208-CAB-NLS, 2016 WL 11622009, at *6 (S.D. Cal. Dec. 22, 2016) ("Several courts have held that the question of whether claims are superseded by CUTSA is a fact-based inquiry better suited for summary judgment than a motion to dismiss."); *I-Flow Corp. v. Apex Med. Techs., Inc.*, No. 07-cv-1200-DMS-NLS, 2008 WL 11342258, at *3

-30-

(S.D. Cal. Apr. 14, 2008) (explaining factual disputes related to CUTSA preemption could not be resolved at the motion to dismiss stage, and holding there was no preemption because, assuming the allegations were true, the non-trade secret allegations formed the basis of the claims); *Bryant v. Mattel, Inc.*, No. CV 04-9049 DOC-RNBx, 2010 WL 3705668, at *22 (C.D. Cal. Aug. 2, 2010) (holding that determination of whether information constitutes trade secrets, for purposes of determining CUTSA preemption, could "be addressed at summary judgment and/or trial."); *U.S. Legal Support, Inc. v. Hofioni*, No. CIV. S-13-01770-LKK-AC, 2013 WL 6844756, at *11 (E.D. Cal. Dec. 20, 2013) (holding that "the question of supersession [by CUTSA] is properly addressed at summary judgment" and not through a motion to dismiss).

Here, Plaintiffs' FAC describes thirteen trade secrets and provides details. *See* FAC at 25–27, ¶ 84. Due to the largely fact-specific analysis required to determine whether the alleged confidential information constitutes trade secrets, the Court finds determination of CUTSA preemption improper at this stage in the proceedings. Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claims for fraud, intentional interference with prospective economic advantage, and violation of the UCL as preempted by CUTSA.

Even if the Court were to assume, *arguendo*, the information alleged constitutes trade secrets, the claims at issue are premised on additional and separate facts. Plaintiffs' claims for fraud, intentional interference with prospective economic advantage, and UCL violations rest on the alleged misrepresentations set forth while negotiating the LOI. Although these misrepresentations led to Defendants' access to the alleged trade secret information, Defendants' misuse of such occurred afterward and is alleged separate and apart from the misrepresentations. Taking away the misappropriation allegations, the claims at issue remain based on misrepresentations made during the LOI process and the resulting delay of Exactech's acquisition of XpandOrtho. Because the claims at issue have independent factual bases and are therefore, at least in part, not based on the same nucleus of facts involving the trade secret misappropriation claims, the Court would deny the

motion to dismiss Plaintiffs' claims for fraud, intentional interference with prospective economic advantage, and violation of the UCL as preempted by CUTSA.

### 5. **Improper Venue**

In passing, Defendants argue that the claims for breach of the implied covenant of good faith and fair dealing and for intentional interference with prospective economic advantage should be dismissed due to improper venue. Motion at 21. Defendants rely solely on 28 U.S.C. § 1406(a) and Rule 12(b)(3) in their short argument.[8] They do not discuss the doctrine of *forum non conveniens.* They do not mention 28 U.S.C. § 1404(a).

---

[8] First, Defendants suggest that the claim for breach of the implied covenant of good faith and fair dealing arises from the LOI and Defendants' alleged larger effort to delay or stop negotiations between XpandOrtho and Exactech. Motion at 21. Second, Defendants contend that the intentional interference with prospective economic advantage claim involves Defendants' alleged interference with XpandOrtho and Exactech's prospective relationship, which caused XpandOrtho to end discussions with Exactech and enter into the LOI with Defendants. *Id.* Defendants argue both of these claims rely on the LOI, and the LOI contains a forum-selection clause specifying Wilmington, Delaware as the exclusive venue for actions arising out of or related to the LOI.[8] *Id.* at 21–22.

Plaintiffs take the position that Defendants waived their venue argument when they agreed not to challenge venue while seeking more time to respond to Plaintiffs' original complaint. Oppo. at 34. Plaintiffs explain Defendants' waiver also should apply to the FAC, because the original complaint involved the same parties and factual circumstances, and repeatedly mentioned the LOI. *Id.* Plaintiffs point out that even if Defendants did not waive their venue challenge, it should fail because Exactech was not a party to the LOI and did not consent to the forum-selection clause. *Id.*

Defendants reply that their "agreement not to challenge venue in response to Plaintiffs' original complaint does not apply to the FAC because Plaintiffs revised the fundamental basis for" the claims at issue. Reply at 13. Defendants assert "Plaintiffs never indicated that they would add the LOI as a basis for their claims when they requested a venue waiver." *Id.* at 13 n.10. Defendants explain the original complaint based the applicable claims on the NDAs, but the FAC based them on the LOI, which is an entirely different agreement containing a forum-selection clause. *Id.* at 14. Defendants further argue Exactech is XpandOrtho's parent company and bound by the LOI. *Id.* at 13. Defendants contend Exactech cannot sue based on the LOI and then claim it is not subject to the LOI's forum-selection clause. *Id.*

The argument is untenable.   In *Atlantic Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, the Supreme Court concludes "that §1406(a) and Rule 12(b)(3) are not proper mechanisms to enforce a forum-selection clause."  571 U.S. 49, 61 (2013). "The appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*," which applies § 1404(a) rather than § 1406(a).  *Atlantic Marine*, 571 U.S. at 55.  The Court explains that when deciding a transfer correctly based on a forum-selection clause, the court should consider only public interest factors, because the clause acts as a waiver of the plaintiff's private interests.  *Id.* at 64.

Because Defendants rely solely on Rule 12(b)(3) and 28 U.S.C. § 1406(a), the motion is denied.  *Atlantic Marine*, 571 U.S. at 61; *see also Deputy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*, No. 21-55126, 2022 WL 761495, at *10 (9th Cir. 2022) (applying 28 U.S.C. § 1404(a) in determining whether the district court abused its discretion when it denied transfer based on a forum-selection clause). Defendants' improper mechanism for enforcement of the forum-selection clause is reason enough to deny Defendants' Motion to Dismiss for improper venue.  Had they instead argued venue on the correct grounds, the outcome would not change.  If one were to use the proper § 1404(a) analysis and consider the public interest factors for transfer, the fact that Defendants seek to dismiss or transfer only two of Plaintiffs' eight claims is a unique factor. Considering only public interest factors, separating the lawsuit among two different courts on opposite sides of the country would lead to inefficiency, delay, and multiplication of expensive proceedings.  It would needlessly waste scarce judicial resources through largely unnecessary duplication of judicial efforts which could lead to varying outcomes. Therefore, consistent with Supreme Court precedent, and Rule 1 of the Federal Rules of Civil Procedure,[9] the Court **DENIES** Defendants' Motion to Dismiss for improper venue.

---

[9]   Rule 1 states that all of the Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.

### 6. <u>Publication of Trade Secrets and Confidential Information</u>

As stated *supra*, Plaintiffs have sufficiently pled claims for breach of contract and misappropriation of trade secrets under the DTSA and CUTSA. *See supra* Part III.A.2.i–ii. Now, however, Defendants argue Plaintiffs' claims for trade secret misappropriation and breach of contract should be dismissed because they "are premised solely on [Defendants'] alleged misuse or disclosure of *public* information." Motion at 22. Defendants contend XpandOrtho published the information that it now alleges are trade secrets, "in journal articles, patent applications and conference papers at least a year before any alleged misappropriation." *Id.* at 23. Specifically, Defendants contend Plaintiffs published: (1) three images taken from the XO[1] Animation; (2) the concept of the unicompartmental (*i.e.*, unicondylar) pneumatic trial implant; and (3) the concept of using magnetic sensors to measure displacement. *Id.* at 23–25. Defendants argue the breach of contract claim should also be dismissed because the trade secrets are public, explaining the NDAs cover only proprietary information, which does not extend to public information. *Id.* at 26

In so arguing, Defendants rely almost entirely on a factual challenge to the confidential nature of the XpandOrtho Trade Secrets. Plaintiffs' FAC alleges XpandOrtho's efforts to protect its confidential and trade secret information. *See* FAC at 29–30, ¶¶ 91–95. Plaintiffs' allegations create a clear factual dispute as to whether the information qualifies as protectable trade secrets.

Essentially, Defendants ask the Court to conclude Plaintiffs' alleged trade secrets are not at all secret. Defendants attach to the Pade Declaration several Exhibits, which it claims prove XpandOrtho's trade secrets were publicized. *See* Exhibits A, B, C, D, E, F, and I to Pade Decl. The Exhibits include scholarly articles in medical journals, a scholarly poster, patent applications, the XO[1] user manual, and screenshots from the XO[1]

Animation.[10]  *See id.*  After a cursory review of the Exhibits, the Court does not find clear publications of the alleged trade secrets on the face of these documents.  For example, Defendants argue Plaintiffs previously disclosed the concept of a unicompartmental or unicondylar pneumatic trial implant and the Court only finds the words unicompartmental and condylar in certain Exhibits.  In addition, although one of the selected images in the FAC and in Exhibit A appear identical, reading the FAC in the light most favorable to Plaintiffs, that particular image could be relating to Plaintiffs' copyright infringement claim because it comes from the XO¹ Animation and involves Defendants' patent illustrations.  *See* FAC at 75, ¶ 261; Exhibit A to Pade Decl. at 4.

To definitively determine whether the alleged trade secrets were previously public, the Court would need to engage in an in-depth analysis of these highly technical documents and resolve factual disputes between the parties.  Such an analysis would require converting the motion to dismiss into a motion for summary judgment.  Therefore, the Court declines to resolve these fact-specific arguments.  *See E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, No. 1:17-cv-00808-DAD-EPG, 2018 WL 2463869, at *6 (E.D. Cal. June 1, 2018) ("The court concludes that the issue of whether all of plaintiffs' alleged trade secrets have been publicly disclosed is a factual issue which is properly the subject of discovery."); *Nelson Bros. Pro. Real Est. LLC v. Jaussi*, No. SA CV 17-0158-DOC-JCGx, 2017 WL 8220703, at *5 (C.D. Cal. Mar. 23, 2017) (citing *DVD Copy Control Ass'n., Inc. v. Bunner*, 116 Cal. App. 4th 241, 252 (2004)) ("Whether the alleged trade secrets are actually generally known to the public is a question of fact and beyond the scope of a motion to dismiss.").  Accordingly, the Court **DENIES** Defendants'

---

[10]   Defendants filed a Motion to File Certain Exhibits, including the XO¹ Animation, (Exhibit G and O to Pade Decl.), Non-Electronically.  ECF No. 45.  The Court granted this Motion but did not receive the specified Exhibits.  ECF No. 73.  However, based on the screenshots of the XO¹ Animation provided, and the Court's conclusion that it will not resolve factual disputes at this stage, the Exhibits are unnecessary for deciding the instant Motion to Dismiss.

Motion to Dismiss Plaintiffs' misappropriation of trade secret and breach of contract claims.

### 7. Fair Use Under the Copyright Act

"The fair use defense permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which the law is designed to foster." *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2803 (2021), (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir. 1997)).  Defendants argue Plaintiffs' claim for copyright infringement of the XO¹ Animation should be dismissed because Defendants' use of the images constitutes fair use.[11]  Motion at 27.  Defendants explain they used three, low-resolution figures from the XO¹ Animation to "illustrate the functionality of a medical device that XpandOrtho itself publicly disclosed . . ." to show "*ORTHOsoft's* improvements to its surgical knee replacement robot . . . ." *Id.*  Defendants argue "[f]air use can be resolved on a motion to dismiss where all of the material facts are properly before the court and not in dispute."  *Id.* at 28 (citing *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008)).

Defendants argue the purpose and character of their use of the XO¹ Animation is

---

[11]  The following factors are considered into determining whether the use of a work constitutes fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C.A. § 107(1)–(4).

1    transformative, because they were used "to show the Patent Office and public an

2    improvement in the field of knee replacements surgery . . . ." *Id.* at 29.  Defendants contend

3    the still images are shown "in a fundamentally different context than the XO¹ Animation.

4    *Id.*  Defendants also claim the purpose of use was to advance science and "not to generate

5    revenue from commercial exploitation . . . ." *Id.*  Defendants argue the nature of the XO¹

6    Animation is factual, meaning it is afforded less protection under copyright law. *Id.* at 29–

7    30.  Defendants argue there is less protection because the images have been published

8    (which the Court already refused to decide). *Id.* at 30.  Defendants argue the substantiality

9    of the portions used from the XO¹ Animation is reasonable, because the use consisted of

10   only three, black and white, isolated still frames from the three-minute Animation.  *Id.*

11   Finally, Defendants argue "there is no market for the XO¹ Animation that could be

12   affected" and even if there were, the only harm to Plaintiffs would be "the loss of

13   opportunity to license the XO¹ Animation to [Defendants] and" other unnamed entities. *Id.*

14   at 31.  Defendants' Reply asserts similar arguments.  Reply at 14–15.

15        Plaintiffs counter that the FAC sufficiently pleads copyright infringement because it

16   alleges "XpandOrtho owns the valid copyright for the XO¹ Animation" and "Defendant[s]

17   copied protected elements in the XO¹ Animation in their patent applications."  Oppo. at 24.

18   Plaintiffs also argue Defendants' affirmative defense of fair use is not appropriate for a

19   motion to dismiss, where facts are in dispute and all inferences must be drawn in favor of

20   Plaintiffs.  *Id.* at 35.  Plaintiffs set forth their factual disputes and further contend that even

21   if the Court were to analyze the issue of fair use, Defendants' arguments are lacking.[12]  *Id.*

22

23   _____

24   [12]    Plaintiffs argue the use of the XO¹ Animation is not transformative because as

25   Defendants state in their Motion, the "figures are used to 'illustrate the functionality of [an

26   XpandOrtho] medical device." *Id.* at 37 (citing Motion at 17).  Plaintiffs also claim that

27   copying the images was a shortcut so that Defendants would not have to "creat[e] their own

28   illustration or, pay[] to license an illustration . . . ." and therefore, the use was to save costs.

     Oppo. at 37.  Plaintiffs contend that Defendants ask the Court to disregard the commercial

     nature of Defendants' use of the images, because "a patent's primary function [is] to

     provide a limited monopoly on making, using, and selling the claimed invention for the

-37-

1  at 35–36.

2       Although the Court may decide fair use at the motion to dismiss stage, here,

3  Plaintiffs dispute several facts regarding the copyrighted work, such as: (1) whether use of

4  the images to illustrate functionality constitutes transformative work; (2) the creative

5  versus factual nature of the work; (3) the video compared to the visual portions of the work

6  submitted to the Copyright Office; (4) the qualitative distinction between the images in the

7  video as compared to those in the patent application; and (5) the commercial benefits of

8  using the images, such as use in the patent illustration industry.  *See id.* at 37–38.  Given

9  the numerous factual issues in dispute, it would be improper to resolve the question of

10  Defendants' fair use on a motion to dismiss; the issue is better suited for summary judgment

11  or trial.  *See Leadsinger*, 512 F.3d at 530 (explaining that deciding fair use on a motion to

12  dismiss is unusual, but may be proper when no material facts are in dispute); *Dr. Seuss*,

13  256 F. Supp. at 1104 (citing *Leadsinger*, 512 F.3d at 530) (explaining that because fair use

14  analysis is a question of law and fact, it is "usually adjudicated either at trial or on a motion

15  for summary judgment where no material facts are in dispute); *ESI Grp. v. Wave Six, LLC*,

16  No. 3:17-cv-02293-AJB-NLS, 2018 WL 6588524, at *5 (S.D. Cal. Sept. 25, 2018) (holding

17  analysis of the fair use defense as premature in deciding a motion to dismiss); *Browne v.*

18  *McCain*, 611 F. Supp. 2d 1073, 1078 (C.D. Cal. Feb. 20, 2009) ("[I]n order to undertake

19  the fair use analysis, a court usually must make factual findings, or rely on undisputed or

20  _____

21  owner's commercial benefit." *Id.*  Plaintiffs also claim the XO[1] Animation is creative due

22  to the included set of sequential illustrations, thus affording copyright protection. *Id.* at 38;

23  *see also* FAC at 81, ¶ 286.  Plaintiffs further argue the copyrighted work is not the two-

24  minute video as a whole, but "the visible portions of the work that were submitted to the

25  Copyright Office for registration." Oppo. at 38.  Plaintiffs contend that Defendants fail to

26  explain how the cropping, resizing, and displayed modifications qualitatively distinguish

27  the images used in the patent applications from the XO[1] animation. *Id.*  Finally, Plaintiffs

28  claim Defendants make conclusory statements that there is no market for the XO[1]

Animation, and that given the patent illustrations industry and Defendants' lack of evidence

to support this claim, the factor weighs in favor of Plaintiffs. *Id.* at 39.

-38-

admitted material facts."). Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claim for copyright infringement on the basis of fair use.

### B.    <u>Request for Judicial Notice</u>

Federal Rule of Evidence 201 authorizes a court to take judicial notice of facts "not subject to reasonable dispute because [they] ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court may take judicial notice of documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Defendants seek judicial notice of nineteen Exhibits attached to the Pade Declaration, including Exhibits A–G, and I–T. ECF No. 44-1 at 2–4. Defendants argue Exhibits D, I, J, N, O, P, and T constitute records or reports from government agencies and are therefore, subject to judicial notice. *See* ECF No. 44-1 at 5–6. Defendants argue Exhibits A–C and E–G are also "subject to judicial notice because these materials are voluntarily published scientific journal articles and presentations readily available online and accessible to the public." ECF No. 44-1 at 6–7. Defendants argue Exhibits A–C and E–G are "not subject to reasonable dispute by Plaintiffs" because they were published by XpandOrtho or its representatives (*i.e.*, Dr. Colwell and Dr. D'Lima). Defendants argue Exhibits K (the LOI), L (the 2015 NDA), and M (the 2018 Amendment), are subject to judicial notice, "because Plaintiffs explicitly and extensively discussed and relied on these documents in their" FAC, incorporating them by reference. ECF No. 44-1 at 7–8. Finally, Defendants argue Exhibits Q, R, and S are subject to judicial notice because they are foreign court documents. ECF No. 44-1 at 8.

Plaintiffs do not oppose the Court taking "judicial notice of Exhibits L and M, but do oppose the use of these exhibits to resolve factual issues in a Rule 12(b)(6) motion, which [Plaintiffs argue] Defendants ask the Court to do." ECF No. 49 at 5. Plaintiffs explain that although the Court may incorporate by reference documents referred to in the FAC, "it is improper to use incorporated documents 'only to resolve factual disputes

against the plaintiff's well-pled allegations in the complaint.'" ECF No. 49 at 5 (citing *Khoja*, 899 F.3d at 1014). On the other hand, Plaintiffs do oppose the Court taking judicial notice of Exhibits A–G, I, J, and T "to show XpandOrtho's trade secrets were public or disclosed at the relevant time period." ECF No. 49 at 3. Plaintiffs explain Defendants are attempting "to resolve disputed issues of fact relating to . . . the scope of the trade secrets and whether the trade secrets are generally known." *Id.* Plaintiffs argue these contested factual disputes are "beyond the scope of a motion to dismiss." *Id.* at 4 (quoting *Nelson Bros.*, No. SA CV 17-0158-DOC-JCGx, 2017 WL 8220703, at *5).

The Exhibits[13] for which Defendants seek judicial notice are largely used in arguing the merits of Defendants' defense in this case. Exhibits A through G, I, L, and M are used to argue that Plaintiffs' alleged trade secrets were publicized and therefore, not offered protection under the NDAs. *See* Motion at 24–26; Exhibit 2 to Motion at 2–3, 12–15. The Court has already determined this issue will not be decided today. *See supra* Part III.A.6. Exhibit K is used to argue improper venue, which the Court also denies. *See supra* Part

---

[13] Exhibits A and B are two scholarly journal articles authored by Dr. Colwell and Dr. Dr. D'Lima (among others) and Exhibit C is a Poster from the Orthopedic Research Society 2016 Annual Meeting. Exhibits A, B, and C to Pade Decl. Exhibit D is a 2015 patent application submitted by XpandOrtho, listing Dr. Colwell and Dr. D'Lima as two of the inventors, and Exhibit I is a 2013 patent application submitted by Dr. Colwell and Dr. D'Lima. Exhibits D and I to Pade Decl. Exhibit E is XpandOrtho's XO¹ User Manual. Exhibit E to Pade Decl. Exhibit F are screenshots from the XOAir Animation. Exhibit F to Pade Decl. Exhibit G was not received by the Court but is said to be the XOAir Animation. Exhibit G to Pade Decl. Exhibit J is a 2018 patent submitted by Defendants. Exhibit J to Pade Decl. Exhibit K is the LOI executed between Defendants and XpandOrtho. Exhibit K to Pade Decl. Exhibits L and M are the 2015 NDA and the 2018 Amendment between Defendants and XpandOrtho. Exhibits L and M to Pade Decl. Exhibit O was not received by the Court but is said to be the copyrighted XO¹ Animation, and Exhibit N is the official certification issued by the U.S. Copyright Office. Exhibits N and O to Pade Decl. Exhibit P is a letter sent to the U.S. Copyright Office as an attachment to the XO¹ Animation. Exhibit P to Pade Decl. Exhibits Q, R, S, and T are foreign court filings and opinions. Exhibits Q, R, and S to Pade Decl. Exhibit T is a Securities and Exchange Commission Form. Exhibit T to Pade Decl.

III.A.5; Motion at 21.  Exhibits N, O, and P are used to support Defendants' fair use argument in the context of Plaintiffs' copyright claim, which the Court likewise will not decide today.  *See supra* Part III.A.7; Motion at 11, 13, 29, 30.  Exhibits Q, R, and S are used to support Defendants' Motion to Strike, which the Court denies based on the relevance of the allegations.  *See infra* Part III.C.1.; Motion at 38, 44.  Finally, Exhibits J and T are used to argue that Defendants were working on a device prior to commencing due diligence with XpandOrtho, which is a factual dispute improper for resolution here.  *See* Motion at 12, 23 n.9.

Because the Court finds the documents unnecessary for deciding today's Motion to Dismiss and Motion to Strike, Defendants' Request for Judicial Notice is **DENIED**.  *See Kahn by & through Kahn v. San Diego Unified Sch. Dist.*, No. 3:17-cv-01008-BEN-WVG, 2018 WL 1963743, at *2 (S.D. Cal. Apr. 25, 2018) (denying a request for judicial notice because the court found the documents unnecessary to resolve the motion to dismiss); *Bols v. Newsom*, 515 F. Supp. 3d 1120, 1124 n.1 (S.D. Cal. Jan, 26, 2021) (Benitez, J.), *reconsideration denied sub nom. JD Bols v. Newsom*, No. 20-cv-873-BEN-BLM, 2021 WL 1313545 (S.D. Cal. Apr. 8, 2021) (quoting *In Re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, No. 16-cv-06391-BLF, 2020 WL 7664461, at *4 (N.D. Cal. Dec. 24, 2020)) ("A court  is not required to take judicial notice of  judicially   noticeable information.").

### C.   <u>Motion to Strike</u>

Defendants move to strike portions of Plaintiffs' FAC, and Plaintiffs request to strike Exhibits 2, 3, and 4 to Defendants' Motion to Dismiss.  Motion at 36–37; Oppo. at 15.

### 1.   <u>Defendants' Motion to Strike Portions of the FAC</u>

Defendants move to strike certain allegations in Plaintiffs' FAC as immaterial, impertinent, and scandalous pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. Motion at 36–37.  Specifically, Defendants move to strike "pages 2–3, paragraph 6, and Section XI (paragraphs 298–309) regarding Defendants' alleged conduct in other cases . . . ."  Motion at 37.  Defendant argues these portions of the FAC relate to three independent

matters: (1) an ITC case involving Defendants and third-party, Haraeus; (2) *Howmedica Osteonics v. Zimmer*, No. 2:11-cv-01857-DMC-JBC (D.J.N.); and (3) ███████ ████████████████. Motion at 37. Defendants argue the matters have "no relevance to the dispute between Plaintiffs and [Defendants], would effectively require re-litigating the unrelated cases, and is offered merely to disparage" Defendants. *Id.*

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Immaterial matters are "those which ha[ve] no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) (internal quotation marks omitted). Impertinent matters "do not pertain, and are not necessary, to the issues in question." *Id.* (internal quotation marks omitted). "Scandalous matters are those that reflect cruelly upon a person's moral character, use repulsive language, or detract from the dignity of the court." *Jadwin v. County of Kern*, 2007 WL 3119670, at *1 (S.D. Cal Oct. 23, 2007) (citing *Skadegaard v. Farrell*, 578 F. Supp. 1209, 1221 (D.N.J. Jan. 19, 1984), *overruled on other grounds*, *Aitchison v. Raffiani*, 708 F.2d (3rd Cir. 1983)).

The purpose of a Rule 12(f) motion "is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation marks omitted). "Motions to strike are generally disfavored and 'should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation.'" *Luxul Tech. Inc. v. NectarLu, LLC*, No. 14-cv-03656-LHK, 2015 WL 4692571, at *3 (N.D. Cal. Aug. 6, 2015) (quoting *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. Apr. 19, 2004)). The decision to grant a motion to strike ultimately lies within the discretion of the trial court. *Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 271–72 (N.D. Cal. Apr. 7, 2015) (citing *Whittlestone*, 618 F.3d at 973); *see Whittlestone*, 618 F.3d at 973 ("We review the district court's decision to strike matter pursuant to Federal Rule of Civil Procedure 12(f) for abuse of discretion.") (internal

1  quotation marks omitted).

2        First, Defendants argue the ITC case with Heraeus resulted in no finding of

3  violations, that some of Heraeus's alleged trade secrets were not trade secrets, and that the

4  case involved bone cements—not soft tissue balancing technology.  Motion at 37–38.

5  Second, Defendants argue the *Howmedica* case is mischaracterized by Plaintiffs, over ten

6  years old, and "related to a preliminary injunction, which did not decide any liability . . ."

7  and "settled without any material findings against [Defendants]."  *Id.* at 39.  Defendants

8  further argue the case involved "the mobility of sales personnel in the spinal medical device

9  industry," which is "wholly unrelated to the present case."  Motion at 39.  Finally,

10  Defendants argue its history with ██████ is immaterial because "it involves unrelated

11  negotiations with no relevance to Plaintiffs' claims."  *Id.* at 40.  Defendants also contend

12  Plaintiffs allege no facts of any "wrongdoing in [Defendants'] interactions with ██████ . .

13  . ."  *Id.*  Defendants explain the matter "involved an independent due diligence process

14  with an entirely different entity,[] and ███████████ ultimately backed out from

15  acquisition discussions."  *Id.*

16        Plaintiffs argue Defendants failed to satisfy their Rule 12(f) burden, because

17  Defendants cannot prove "the allegations at issue could have 'no possible bearing' on the

18  litigation."  Oppo. at 39–40 (citing *Simpson Performance Prods., Inc. v. NecksGen Inc.*,

19  No. 3:18-cv-01260-BEN-MDD, 2019 WL 4187463, at *3 (S.D. Cal. Mar. 25, 2019)

20  (Benitez, J.)).  Plaintiffs further argue the allegations are material to exemplary damages,

21  because when deciding whether to award such damages, "a court will consider whether the

22  conduct involved repeated actions or was an isolated incident."  Oppo. at 40 (citations

23  omitted).   Plaintiffs also argue the allegations are not scandalous because Defendants'

24  actions "are indications of [Defendants'] repeated practice of trade secret

25  misappropriation."  *Id.* at 44.  Plaintiffs argue the language may be strong but it is not

26  scandalous, because it does "nothing more than accurately describe facts pertaining to

27  [Defendants'] own repetitive misconduct."  *Id.*

28

Plaintiffs' allegations could have relevance to their claims. *Wilson v. Wal-Mart Stores, Inc.*, No. 05-cv-1216-BEN-BLM, 2005 WL 3477827, at *5 (S.D. Cal. Oct. 12, 2005) (quoting *Miller v. Group Voyagers, Inc.*, 912 F.Supp. 164, 168 (E.D. Pa. Jan. 26, 1996)) ("Motions to strike 'are not favored and will generally be denied unless the material bears no possible relation to the matter at issue and may result in prejudice to the moving party.'"). The Court will not decide whether those allegations are true at this stage in the proceedings or the extent to which they are relevant.

It is well established that district courts have broad discretion in determining motions to strike. Here, striking allegations is not warranted. *See Wilson*, No. 05-cv-1216-BEN-BLM, 2005 WL 3477827, at *1 (citing *Anchor Hocking Corp. v. Jacksonville Elect. Authority*, 419 F.Supp. 992, 1000 (D.C. Fla. Aug. 10, 1976)) ("While the Court has broad discretion in disposing of motions to strike, they are granted only where clearly warranted."); *see also Vess v. Bank of Am., N.A.*, No. 10-cv-920-AJB-WVG, 2012 WL 113748, at *12 (S.D. Cal. Jan. 13, 2012) (citing *Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (9th Cir. 2000)) ("The decision whether to grant a motion to strike is within the broad discretion of the district court.")

Because Plaintiffs' allegations regarding Defendants' pattern of behavior bears some relevance to the claims at issue, the Court **DENIES** Defendants' Motion to Strike portions of Plaintiffs' FAC.

## 2. Plaintiffs' Request to Strike Exhibits 2 Through 4

On procedural grounds, Plaintiffs ask the Court to strike Exhibits 2, 3, and 4 from Defendants' Motion, because "each exhibit contains new legal and factual analysis that should count toward the [Motion's] page limit." Oppo. at 15. Plaintiffs point out the Court's Order extending the page limit by ten additional pages and now argue the Exhibits at issue expand on arguments related to the public nature of XpandOrtho's trade secrets, as well as Defendants' fair use defense and Rule 9(b) arguments. *Id.*; *see also* Exhibits 2, 3, and 4 to Motion. Plaintiffs contend these Exhibits amount to a twenty-six-page extension of said arguments and "[c]onsideration of these exhibits would prejudice Plaintiffs' ability

-44-

to fully respond."  Oppo. at 15 (citing S.D. Cal. Civ. R. 1.1(e)(2), 7.2).  Alternatively, Plaintiffs ask that the Exhibits be disregarded as a violation of the Court's Order.  Oppo. at 15.

Defendants reply that Exhibits 2 through 4 only "summarize the material already in other exhibits and analyzed in" the Motion and are provided solely as a helpful reference to the Court's evaluation of the parties' arguments and relevant facts.  Reply at 17. Defendants view the Exhibits as compliant with normal practice and note that similar Exhibits were included in their motion to dismiss Plaintiffs' original complaint, with no objection from Plaintiffs.  *Id.* at 17 n.11.

In *Sidney-Vinstein v. A.H. Robins Co.*, the Court held that "[u]nder the express language of . . . [Rule 12(f)], only pleadings are subject to motions to strike."  697 F.2d 880, 885 (9th Cir. 1983).  There, the district court's decision to strike the plaintiff's motion for reconsideration was appealed.  In holding that the district court erred in striking the plaintiff's entire motion, the Court further explained, "[t]he appellees have cited no cases that have construed . . . [Rule 12(f)] as allowing a district court to strike material not contained in the pleading."  *Sidney-Vinstein*, 697 F.2d at 885.  However, it is a well-established rule that district courts have the inherent right to control their own dockets, *see, e.g.*, *Landis v. N. Am.*, 299 U.S. 248, 254 (1936), and several courts have interpreted this right to include the power to strike documents other than pleadings.  *See Lamos v. Astrue*, 275 F. App'x 617, 618 (9th Cir. 2008); *In re Acadia Pharms. Inc. Secruties Litig.*, No. 18-cv-01647-AJB-BGS, 2020 WL 2838686, at *3 (S.D. Cal. June 1, 2020); *Cheng Jiangchen v. Rentech, Inc.*, No. CV 17-1490-GW-FFMx, 2017 WL 10363990, at *2 (C.D. Cal. Nov. 20, 2017).  Furthermore, "[t]he district court has considerable latitude in managing the parties' motion practice and enforcing local rules that place parameters on briefing."  *See also Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002).  Included in that right, is the Court's ability to strike exhibits from the record.  *See In re Acadia Pharms*, No. 18-cv-01647-AJB-BGS, 2020 WL 2838686, at *3 (striking an exhibit supporting a motion to dismiss holding the chart therein, "identify[ing] 108 statements [and] encompassing 38

-45-

paragraphs of the complaint," was "simply an extension of Defendants' argument and thus, . . . exceeded the . . . page limit for their briefs.").

Exhibit 2 contains four tables. Exhibit 2 to Motion at 2–16. The first table lists what Defendants allege are public disclosures of XpandOrtho's supposed trade secrets (including journal articles, posters, patent applications, and the XO¹ User Manual and Animation), along with three explanatory footnotes. *Id.* at 2. The second table shows images corresponding to paragraphs in the FAC alongside images of what Defendants claim XpandOrtho publicly disclosed. *Id.* at 3–5. The third table provides conceptual phrases from the FAC, citing the specific paragraphs, alongside XpandOrtho's alleged public disclosures and wording in Defendants' patent applications. *Id.* at 6–7. The fourth table also provides conceptual phrases from the FAC, comparing them to XpandOrtho's alleged public disclosures, along with information Defendants claim was within their prior knowledge. *Id.* at 8–16. Exhibit 3 contains a table of still images of the XO¹ Animation, and corresponding FAC citations, with portions of Defendants' patent applications in support of Defendants' fair use argument. Exhibit 3 to Motion at 3–10. Exhibit 4 contains a chart of Plaintiffs' fraud allegations—citing specific paragraphs and including certain phrasing—indicating the allegations associated with each specific claim for relief. Exhibit 4 to Motion at 2–3. Exhibit 4 also includes one explanatory footnote. *Id.* at 2.

While Exhibits 2 through 4 would be useful in resolving factual disputes and whether all of the eight claims sound in fraud, the Court declines to resolve such factual disputes at this stage in the proceedings and already determined which claims sound in fraud. *See supra* Part III.A.2 and III.A.6–7. Although the Court will not use the Exhibits to determine factual disputes and the issue of whether the FAC sounds in fraud, it is unnecessary to strike the Exhibits from the Motion. Therefore, Plaintiffs' request to strike Exhibits 2 through 4 is **DENIED** and Plaintiffs' request to disregard the Exhibits is **GRANTED**.

### D.   Motion for Leave to File Documents Under Seal

Except for certain documents "traditionally kept secret," federal courts begin a sealing analysis with "a strong presumption in favor of access to court records." *Foltz v.*

*State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  A party seeking to seal a judicial record must "articulate [] compelling reasons supported by specific factual findings," *id.*, that outweigh the general history of access and the public policies favoring disclosure, such as the "public interest in understanding the judicial process." *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995).  The Court "conscientiously balance[s] . . . the competing interests" of the public and the party who seeks to keep certain judicial records secret.  *Foltz,* 331 F.3d at 1135.  After considering these interests, if the Court decides to seal certain judicial records, it "base[s] its decision on a compelling reason and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture." *Hagestad*, 49 F.3d at 1434; *see also Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (applying compelling reasons standard to dispositive motions).

"[S]ources of business information that might harm a litigant's competitive standing" may also constitute a compelling reason to seal, *see Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978), such as a company's confidential profit, cost, and pricing information, which if publicly disclosed could put the company at a competitive disadvantage.  *See Apple, Inc. v. Samsung Elec. Co.*, 727 F.3d 1214, 1225 (Fed. Cir. 2013) ("[I]t seems clear that if Apple's and Samsung's suppliers have access to their profit, cost, and margin data, it could give the suppliers an advantage in contract negotiations, which they could use to extract price increases for components.").  Proprietary information can also be sealed to protect a business from potential harm.  *See Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, No. 15-cv-00595-BAS-MDD, 2017 WL 6270268, at *2 (S.D. Cal. Dec. 8, 2017) (granting a motion to file documents containing proprietary business information under seal).

### 1.    Defendants' Motions to File Under Seal

Defendants' Motions to File Under Seal seek to redact from the public record portions of text in its Motion, Reply, Exhibit 2 to its Motion, and Exhibit H to the Pade Declaration.  *See* ECF Nos. 46, 56.  The unredacted versions of such are lodged as ECF Nos. 47 and 57.  Defendants argue the sentences they seek to seal consist of: (1) Plaintiffs'

alleged trade secrets and confidential information; (2) portions of the LOI that discuss price and other sensitive terms; (3) confidential information related to the parties' business practices and acquisition discussions; and (4) acquisition dicussions involving third parties. ECF No. 46 at 2–3; ECF No. 56 at 2.  Defendants further argue that much of the sealed information is based on the Court's prior order granting-in-part Planitiffs' motion to file portions of the FAC under seal.  ECF No. 46 at 3; ECF No. 56 at 2.

Because the information Defendants seek to seal is narrowly tailored and consists of alleged trade secrets and other confidential information, as well as the statements sealed in Plaintiffs' FAC, Defendants' Motions to File Under Seal are **GRANTED**.  The Clerk is directed to file under seal unredacted versions of the documents and Exhibits Lodged at Docket Numbers 47 and 57.

## 2. <u>Plaintiffs' Motion to File Under Seal</u>

Plaintiffs' Motion to File Under Seal seeks to redact from the public record certain portions of its Opposition to Defendants' Motion to Dismiss and Strike.  *See* ECF No. 51. The unredacted version of Plaintiffs' Opposition is lodged as ECF No. 52.  Plaintiffs argue the portions of text it seeks to seal contain confidential information related to the nature of their trade secrets, confidential business practices, and other proprietary data—"disclosures of which would result in serious competitive harm to Plaintiffs."  ECF No. 51 at 2. Plaintiffs further argue the only information it has sealed "is the same or substantially related to the information this Court authorized for sealing previously.  *Id.*

Because the information Plaintiffs seek to seal is narrowly tailored and consists of alleged trade secrets and other confidential information, as well as the statements sealed in Plaintiffs' FAC, Plaintiffs' Motion to File Under Seal is **GRANTED**.  The Clerk is directed to file under seal the unredacted version of Plaintiffs' Opposition at Docket Number 52.

## IV. <u>CONCLUSION</u>

The Court rules on the above motions and requests as follows:

1. Defendants' Motion to Dismiss is **DENIED**.

2. Defendants' Motion to Strike in Part Plaintiffs' FAC is **DENIED**.

3.      Defendants' Request for Judicial Notice is **DENIED**.

4.      Plaintiffs' Request to Strike Defendants' Exhibits 2 through 4 is **DENIED**, but Plaintiffs' Request to Disregard the Exhibits is **GRANTED**.

5.      The parties' Motions to File Documents Under Seal are **GRANTED**.

**IT IS SO ORDERED.**

DATED:     March 15, 2022

_____

**HON. ROGER T. BENITEZ**
United States District Judge